UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/22/2023
```

-------------------------------------------------------------- X
                  :
SUNIL MADHU,               :
                  :
           Plaintiff,   :
                  :
        -v-         :        1:22-cv-682-GHW
                  :
SOCURE INC.,           :       MEMORANDUM
                  :     OPINION & ORDER
          Defendant.  :
                  :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Plaintiff Sunil Madhu founded Defendant Socure, Inc.  His options to buy nearly 10 million shares of the company's stock at an exercise price of pennies per share make him a very wealthy man by any measure.  He contemplated the exercise of his options at a time when he believed the shares to be valued at $1.98.  He did not consummate the exercise of his options at the time, in part because the company did not believe that the $1.98 valuation was valid—they had recently received an offer to invest in the company at $16 per share, over eight times the $1.98 valuation.  And the shares were worth $8.72 per share when this action was filed.

      That the shares appreciated in value from the time that he first contemplated the exercise of his options made Mr. Madhu even richer—the gross value of the shares was over $87,000,000 at the higher valuation, as opposed to over $19,000,000 at the lower valuation.  Mr. Madhu brought this suit to require the company to allow him to exercise his options assuming that the lower valuation applied.  Why?  Because even though the higher value of his shares makes him a richer man, even net of taxes, the fact that his shares became more valuable before he could exercise his options requires Mr. Madhu to pay taxes that he wishes to avoid.

Mr. Madhu brought this breach of contract action to require the company to treat his exercise as having been effective when the valuation was $1.98 so that he could avoid paying those taxes, or to force the company to pay the amount of taxes that he might have avoided paying as damages. Because Mr. Madhu did not properly exercise his options in accordance with the terms of his agreements, his demand to force the company to treat him as having properly exercised his options at an earlier date must be denied. However, because there is—on this record—a plausible argument that Defendant failed to conduct a timely valuation of his shares following a demand, the motion dismiss is granted in part and denied in part.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    The 2014 and 2018 Stock Option Awards and the Omnibus Incentive Plan

Sunil Madhu founded Socure, a company that provides digital identification and fraud solutions, in 2012. AC ¶ 2. He left the company in February 2019. *Id.* ¶ 3. At that time, he held options to purchase nearly ten million shares of the company's common stock. *Id.* ¶¶ 3, 11–12. The options were awarded pursuant to two option grants. The first option grant was awarded on November 17, 2014, and gave him the right to purchase up to 6,758,421 shares of Socure common stock at an exercise price of $0.07 per share (the "First Option Award"). *Id.* ¶ 11. The second was awarded on June 1, 2018, and gave him the right to purchase up to 3,221,211 shares of Socure common stock at an exercise price of $0.11 per share (the "Second Option Award," and together with the First Option Award, the "Option Awards"). *Id.* ¶ 12.

---

[1] Unless otherwise noted, the facts are drawn from the Amended Complaint ("AC"). Dkt. No. 27. The facts are accepted as true for purposes of this motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The documents governing Madhu's Option Awards include the terms and conditions of the First and Second Options Awards—which are identical in relevant part—and the Omnibus Incentive Plan (the "Plan"), which is incorporated by reference in its entirety into the terms of the Option Awards. *See* Dkt. No. 37, Declaration of Aric H. Wu ("Wu Decl."), Ex. 1 (Plan), Ex. 2 (First Option Award) at § 1, Ex. 3 (Second Option Award) at § 1.[2]

Because this lawsuit stems from Madhu's attempts to exercise his options, the Court believes that it will be useful to the reader to lay out the relevant provisions in the Option Awards and the Plan. Section 2 of each of the Option Awards sets forth the process for exercising the options as follows:

(a) <u>Right to Exercise</u>. This Option shall be exercisable, in whole or in part, during its term in accordance with the Vesting Schedule set out in the Notice of Grant and with the applicable provisions of the Plan and this Option Agreement. No shares shall be issued pursuant to the exercise of an Option unless the issuance and exercise comply with applicable laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to the Participant on the date on which the Option is exercised with respect to such shares. The Committee may, in its discretion, (i) accelerate vesting of the Option, or (ii) extend the applicable exercise period to the extent permitted under Section 6.03 of the Plan. If the exercise period is extended beyond ninety (90) days following any Termination of Service, an exercise of the Option during the extended period will not be treated as the exercise of an ISO to the extent so required by applicable law or regulation.

(b) <u>Method of Exercise</u>. The Participant may exercise the Option by delivering an exercise notice to the Chief Executive Officer of the Corporation in a form approved by the Corporation (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Corporation. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all shares exercised. This Option shall be deemed to be exercised upon receipt by the Corporation of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

---

[2] The Wu Declaration, Dkt. No. 37, includes as separate exhibits the documents that were attached to the Amended Complaint as a single exhibit, including the Plan and the First and Second Option Awards. For clarity of reference, this opinion cites to the Wu Declaration for these documents.

AC ¶¶ 14–15; Dkt. No. 37-2 at § 2; Dkt. No. 37-3 at § 2.[3]

Section 13(a) of the First Option Award (and § 15(a) of the Second Option Award) prescribe acceptable forms of notice as follows:

> Notices. All notices, requests, deliveries, payments, demands and other communications which are required or permitted to be given under these Terms and Conditions shall be in writing and shall be either delivered personally or sent by registered or certified mail, or by private courier, return receipt requested, postage prepaid to the parties at their respective addresses set forth herein, or to such other address as either shall have specified by notice in writing to the other. Notice shall be deemed duly given hereunder when delivered or mailed as provided herein.

Dkt. No. 37-2 at § 13(a); Dkt. No. 37-3 at § 15(a).

Finally, the Plan defines "Fair Market Value" for purposes of option awards:

> Fair Market Value means, on any date, (i) the closing sale price of a share of Common Stock as reported on an established stock exchange on which the Common Stock is regularly traded on such date or, if there were no sales on such date, on the last date preceding such date on which a sale was reported; or (ii) if shares of Common Stock are not listed for trading on an established stock exchange, Fair Market Value shall be determined by the Committee in good faith and otherwise in accordance with Section 409A of the [Internal Revenue] Code [of 1986, as amended], and any regulations and other guidance thereunder.[4]

Dkt. No. 37-1 at § 2.18.

## 2. Madhu's Attempts to Exercise His Options

On May 24, 2021, Madhu told Avi Aronovitz, Socure's CFO, and Aviad Levin, Socure's Senior Vice President Legal, that he intended to exercise his options. AC ¶ 17. Madhu also told the pair he wanted to transfer some of the shares he would receive after exercising his options to a family trust and special purpose vehicle ("SPV"). Id. Aronovitz and Levin told Madhu that if he exercised his options, he would be subject to an alternative minimum tax. Id. ¶ 18. They also told

---

[3] Because the First and Second Option Awards are identical in relevant part, this opinion generally cites only to the First Option Award.

[4] Section 409A of the Internal Revenue Code governs the inclusion in gross income of deferred compensation under nonqualified deferred compensation plans. 26 U.S.C. § 409A.

him that transferring the stock to the trust and SPV would violate his obligation to offer Secure the right of first refusal prior to any transfer of his shares in the company. *Id.* Madhu asserts that both of those statements were wrong, "but they required Madhu to consult with legal and tax experts costing him time and money." *Id.*

Madhu decided to move forward with his plan to exercise his options. *Id.* ¶ 19. "That plan could not be accomplished immediately because Madhu needed to gather the funds necessary to pay not only the exercise price for the shares, but also the ordinary income tax he understood would have to be paid at the time of the exercise of his options." *Id.*

In anticipation of his anticipated exercise, Madhu ran a simulation on Carta—an application used by some private companies, including Secure, for the management of equity investments—to determine the amount of money required to exercise his options and pay the applicable taxes on his realized gains. *Id.* ¶¶ 19, 21. For Madhu's First Option Award, the cost to acquire 6,758,421 shares at $0.07 per share was $473,089.47, the gain on those shares at a fair market value of $1.98—which was the fair market value approved by Secure's board of directors in May 2021—was $12,908,584.11, and the taxes owed on that gain totaled $5,563,804.59. *Id.* ¶ 22. For the Second Option Award, the cost to acquire 3,221,211 shares at $0.11 per share was $354,333.21, the gain on those shares at a fair market value of $1.98 was $6,023,664.57, and the taxes owed on that gain totaled $2,601,017.18. *Id.* ¶ 23. Taken together, Madhu determined that he needed $8,992,224.45 to exercise his stock options, consisting of $827,422.68 for the exercise price and $8,164,821.77 for taxes. *Id.* ¶ 24.

On October 4, 2021, Madhu had amassed the $8,992,224.45 he needed to exercise his options at the $1.98 per share figure that was, at that time, still reflected in Carta. *Id.* ¶¶ 25, 28. Madhu informed Aronovitz of his intent to move forward. *Id.* ¶ 25. Aronovitz responded that Secure would not issue the shares at that price because the May 2021 valuation of $1.98 per share

"was only good for six months." *Id.* ¶ 26. Aronovitz told Madhu that Socure would "have a better sense of the [fair market value] in 2-3 weeks." *Id.* ¶ 27.

Madhu was later told that Aronovitz's statements were informed by the fact that Socure had entered into a non-binding term sheet with a group of investors to inject $450 million into Socure just days before. *Id.* ¶ 29. That term sheet provided for the investors to receive shares of Socure preferred stock at a value of $16 per share. *Id.* Despite the term sheet's $16 per share value, Madhu maintains here that the operative value of the shares for purposes of his exercise was still $1.98 per share. The effect of an exercise under those terms would be that Madhu's shares would be worth $16 per share, but he would only pay taxes as if they were worth less than $2 per share.[5]

On October 11, 2021, Madhu tried to exercise his options using Carta—which he alleges Socure used for the exercise of stock options. *Id.* ¶ 21. At that time, Carta still reflected a fair market value of the common stock at $1.98 per share. *Id.* ¶ 28. Madhu found that he could not exercise his options using Carta because Socure had disabled the "execute" function on the site. *Id.*

Despite the roughly $14 difference between the $16 per share value in the term sheet and the $1.98 per share value Madhu sought to use, Madhu "insisted" that Socure consummate the exercise of his options. *Id.* ¶ 31. However, Socure claimed not to know the fair market value of its common stock. *Id.* ¶ 37. On October 21, 2021, for example, Levin, the company's chief legal officer, told Madhu that he expected "that we will have a new valuation around January [2022], but cannot be certain." *Id.* That same day, Aronovitz wrote to Madhu, telling him that "once we have the revised 409A, it will be applicable to all transactions back to September." *Id.* Madhu offered to have an

---

[5] Implicit in Madhu's position seems to be a belief that the value that the company ascribes to the shares upon exercise will dictate his tax liability—in other words, that so long as the company says that the shares were worth $1.98 at the time of exercise, Madhu can take the tax position that they were worth that amount at the time of exercise, despite his knowledge that they had a higher actual valuation at the time. The Court takes no position on the proper tax treatment of this transaction.

independent valuation of the common stock shares performed to determine the impact of the term sheet. *Id.* ¶ 31. Secure declined that offer and refused to issue any shares to Madhu. *Id.* ¶¶ 31, 33.

On October 26, 2021, Madhu sent completed exercise forms together with checks for the exercise price—based on the $1.98 per share valuation—to what he believed was Secure's New York address via FedEx overnight delivery. *Id.* ¶ 33. At the same time, he emailed Aronovitz and Levin the forms and photocopies of the checks. *Id.* ¶ 34. Aronovitz replied that Secure had moved its office to Nevada, and Madhu later received confirmation from FedEx that his package had been redirected and delivered to Secure's Nevada address on October 28, 2021. *Id.*

On November 4, 2021, Madhu contacted two members of Secure's board of directors (the "Board"), recounting the situation and asking them to honor the $1.98 per share valuation. *Id.* ¶ 38. One of the Board members responded, saying, "I plan to share and discuss [your concerns] with our advisors and make sure that we get back to you with a clear and timely response." *Id.* Neither Board member told Madhu that Secure's Board made a new determination of the fair market value of the common stock. *Id.* ¶ 39.

Around the second week of November 2021, after Secure's financing transaction was finalized, it reenabled the execute function on Carta. *Id.* ¶ 41. Madhu then attempted to use Carta to exercise of his options. *Id.* However, Carta displayed the fair market value of the common stock as "price in flux." *Id.* Carta currently lists Madhu's attempted November 2021 exercise as "pending." *Id.* ¶ 42. Carta showed the fair market value of the common stock as $8.72 per share when Madhu filed his Amended Complaint. *Id.* Madhu asserts that he has been provided with no explanation for the $8.72 per share valuation. *Id.*

### 3. The Gift Trust

Had his option exercise gone forward earlier in the year, as he wished, it was Madhu's intent to transfer a block of shares to a trust for the benefit of his descendants. This transaction too was

driven by Madhu's desire to avoid paying taxes.  He "intended to transfer to the Gift Trust the highest number of shares possible free of federal gift and generation skipping tax, up to a value of $11.7 million." *Id.* ¶ 47.  "Had Socure issued shares of stock to Madhu when he exercised his options, he would have transferred a portion of those shares shortly thereafter to the Gift Trust at a relatively low fair market value." *Id.*  If Madhu could present the value of the shares to the IRS as $1.98 per share, while their true value was substantially greater, he would have been able to transfer effectively an asset with a value substantially higher amount than the $11.7 million generation skipping tax exclusion without tax consequences.  Madhu complains of his lost opportunity to implement that maneuver in this action.

In December 2021, with his options still un-exercised, Madhu decided to attempt a transfer of some of his options to an irrevocable grantor trust (the "Gift Trust") for his descendants.  *Id.* ¶ 47.  Although § 5 of the Option Awards prohibit lifetime transfers,[6] Socure told Madhu that it would consent to the transfer of his options to the Gift Trust if he released Socure from any and all legal claims related to the Option Awards.  *Id.* ¶ 49.

### B.    Procedural History

On January 3, 2022, Madhu filed this lawsuit in the Supreme Court of the State of New York, County of New York.  Dkt. No. 1.  On January 26, 2022, Socure removed the action to this Court based on diversity jurisdiction.  *Id.*  On February 23, 2022, following a February 10, 2022 pre-motion conference on Socure's proposed motion to dismiss, Madhu filed his Amended Complaint.  Dkt No. 27.  The Amended Complaint asserts claims for specific performance, declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing.  AC ¶¶ 50–77.

---

[6] "This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of the Participant only by the Participant."  First Option Award § 5.

On March 30, 2022, Socure filed this motion to dismiss the Amended Complaint, Dkt. Nos. 35, 36 ("Def's Mem."), accompanied by a declaration with ten exhibits, Dkt. No. 37. On April 20, 2022, Madhu filed his memorandum of law in opposition to Socure's motion to dismiss. Dkt. No. 40 ("Pl's Opp'n"). On April 27, 2022, Socure filed its reply. Dkt. No. 41 ("Reply").

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  As the Second Circuit stated in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Circ. 2020) (citations omitted).  "The term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Id.* (cleaned up) (citations omitted).  However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted).  Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

A court may also consider documents that are "integral to" the complaint. *Id.*  For a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects.  *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint." (internal quotation marks omitted)).  "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*  "In most instances where this exception is

10

recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint." *Glob. Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Socure's motion to dismiss is accompanied by the declaration of Aric H. Wu, which attaches ten documents as exhibits. *See* Dkt. No. 37. Here, the Court has considered exhibits 1 through 4, which are copies of written instruments that were attached to Madhu's complaint, including the First and Second Option Awards, the Plan, and the Omnibus Incentive Plan form of Exercise Notice. *Compare* Dkt. Nos. 37-1 to -4, *with* AC, Ex. A. These written instruments are treated as part of the Amended Complaint and may properly be considered on a motion to dismiss. *See Lynch*, 952 F.3d at 79 (citations omitted); *see also* Fed. R. Civ. P. 10(c).

Exhibit 5 consists of a handful of early October 2021 text messages between Madhu and Aronovitz discussing, among other things, the fair market value of Socure stock, 409A valuations, and Aronovitz's statement that he would "have a better sense of the [fair market] value in 2-3 weeks." Dkt. No. 37 at ¶ 6. The text exchange is paraphrased and directly quoted in the Amended Complaint. *Compare* Dkt. No. 37-5 *with* AC ¶¶ 25–27. These statements form part of the basis for Madhu's claims for breach of contract and breach of the implied covenant. *See* AC ¶ 27 (alleging that Aronovitz's statement that he would "have a better sense of the [fair market] value in 2-3 weeks" was "intended to delay and ultimately thwart Madhu from exercising his stock options"); *id.* ¶ 65 (alleging Socure breached by "taking actions to delay and prevent Madhu from exercising his stock options); *id.* ¶¶ 70–71 (alleging breach of the implied covenant by delaying and preventing Madhu from exercising his stock options). These communications are therefore integral to the Amended Complaint and may be considered in connection with this motion. *See DiFolco*, 622 F.3d at 111 (citations omitted).

11

Exhibit six is a transcription of a voicemail Madhu left for Aronovitz in early October 2021. Dkt. No. 37 at ¶ 7.  The Amended Complaint does not specifically refer to this voicemail.  While it is possible the voicemail is one of the communications generally referred to in the Amended Complaint, *e.g.*, AC ¶ 33 (alleging "a number of back-and-forth communications during October 2021"), nothing in the Amended Complaint permits the Court to find that it is integral.  This voicemail transcription will therefore not be considered here.  *See DiFolco*, 622 F.3d at 111 (citations omitted); *Sira*, 380 F.3d at 67.

Exhibits 7 is a term sheet for Socure Series E preferred stock entered into on September 29, 2021.  Dkt. No. 37 at ¶ 8.  The Amended Complaint refers to this term sheet and relies heavily on its terms and effects.  *See* AC ¶¶ 29–31, 36–37, 38, 45.  The Court therefore may consider Exhibit 7. *See DiFolco*, 622 F.3d at 111 (citations omitted).

Exhibit 8 consists of photographs of the contents of a package FedEx delivered to Socure from Madhu on October 28, 2021.  Dkt. No. 37 at ¶ 9.  Madhu does not dispute that this exhibit is what Socure says it is.  The Amended Complaint makes definite and substantial reference to these documents, *see, e.g.*, AC ¶¶ 33–34, and Madhu alleges that this package constituted his late-October 2021 exercise, *see id.* ¶ 59.  The documents are both incorporated by reference in, and integral to, the Amended Complaint and may therefore be considered.  *See DiFolco*, 622 F.3d at 111 (citations omitted).

Exhibit 9 is a draft Option Amendment and Transfer Agreement that Madhu sent to Aronovitz and Socure's outside corporate counsel at Cooley LLP on December 23, 2021.  Dkt. No. 37 at ¶ 10.  This document is not incorporated by reference in or integral to the Amended Complaint.  *See* AC ¶¶ 48, 49.  Accordingly, this exhibit will not be considered.

Exhibit 10 is an article about IRS § 409A that is neither incorporated by reference in nor integral to Madhu's Amended Complaint. Rather, Socure cites this document as authority. *See* Def's Mem. at 21. The Court will consider this document inasmuch as it is presented as legal authority.

## III.    DISCUSSION

### A.    Breach of Contract

#### i.    The Amended Complaint Plausibly Alleges a Breach of § 2.18 of the Plan

Madhu plausibly alleges that Socure breached § 2.18 of the Plan. The Plan and Option Awards are governed by Delaware law. AC ¶ 13; *see also* Dkt. No. 37-1, § 11.10. To state a claim for breach of contract under Delaware law, a "plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003). Where stock option agreements are involved, "precise compliance with the terms of the option is required before the sale is enforced." *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, No. CV 8520-VCG, 2017 WL 1191061, at *30 (Del. Ch. Mar. 30, 2017).

The parties do not dispute the existence of an enforceable contract between Madhu and Socure. The first element is therefore satisfied. With respect to the second element—the breach of a contractual obligation—Madhu alleges that Socure breached § 2.18 and § 6.04 of the Plan. Section 2.18 states:

> Fair Market Value means, *on any date*, (i) the closing sale price of a share of Common Stock as reported on an established stock exchange on which the Common Stock is regularly traded on such date or, . . . (ii) if shares of Common Stock are not listed for trading on an established stock exchange, Fair Market Value *shall be determined by the Committee* in good faith and otherwise in accordance with Section 409A of the Code, and any regulations and other guidance thereunder.

Dkt. No. 37-1 at § 2.18 (emphasis added). According to Madhu, this provision should be read as an affirmative covenant that requires Socure to determine the fair market value of its stock on any date

that he seeks to exercise his options.  *See* Pl's Opp'n at 8–9, 14, 19.[7]  Madhu alleges that he tried to exercise his options in October 2021 and that Socure failed to determine the fair market value of its common stock on any date in October.  *See* AC ¶¶ 37, 39.  Madhu therefore alleges that Socure breached § 2.18 of the Plan.

The third and final element—damages—is also satisfied.  Under Delaware Law, a plaintiff is not required to plead damages "with precision or specificity."  *Quarum v. Mitchell Int'l, Inc.,* C.A. No. N19C-03-087 AML CCLD, 2020 WL 351291, at *7 (Del. Super. Ct. Jan. 21, 2020) (citing *VLIW Tech,* 840 A.2d at 611).  The "relevant question" at this stage "is not whether a particular species of damages alleged can be cataloged with scientific precision, but rather, whether the plaintiff made a 'short and plain statement' of a conceivable injury that might be measured in cash by a fact-finder."  *Blue Cube Spinco LLC v. Dow Chem. Co.,* No. CVN21C01214PRWCCLD, 2021 WL 4453460, at *12 (Del. Super. Ct. Sept. 29, 2021) (quoting Del. Super. Ct. R. Civ. P. 8(a)).

Here, Madhu alleges that he will incur additional tax liability if the Fair Market Value is higher now than when he tried to exercise in October 2021, as the Amended Complaint alleges.  AC ¶ 40.  Socure argues that Madhu is not entitled to damages because he did not validly exercise his options on October 4 or 11, 2021, and thus there was no breach to serve as a basis for damages.  Def's Mem. at 22.  However, as noted above, Madhu alleges that Socure breached by failing to comply with its affirmative obligation to provide a Fair Market Value pursuant to § 2.18 of the Plan, and damages can be calculated from that date.

---

[7] The parties did not brief the question of whether this language is ambiguous.  Nonetheless, the Court observes that § 2.18 is arguably ambiguous.  Language in a contract "is ambiguous if it is susceptible to more than one reasonable interpretation."  *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) (citation omitted).  In addition to the interpretation put forward by Madhu, § 2.18 could arguably also be reasonably interpreted to mean that the fair market value on any given date is whatever the Committee then determines or has determined it to be, without requiring the Committee to assemble to determine fair market value the same day Madhu seeks to exercise.  The Court also observes that this language resides in the definitions section of the contract, where one would not normally expect an affirmative covenant.  It also lacks language specifying what is required to trigger the Committee's obligations under this provision, whatever they may be.  Because the parties did not brief whether this language is ambiguous, the Court assumes it has Plaintiff's meaning for purposes of deciding this motion.

Socure also argues that Madhu has not sufficiently alleged damages because Carta listed the price in October 2021 as "in flux," meaning "it is not a foregone conclusion" that the Fair Market Value and associated taxes as of October 2021 would be less than they would be at a later date. Reply at 10.  That Carta reflected the price as "in flux" does not foreclose the Fair Market Value from having been lower in October 2021 than it is now.  Indeed, the Amended Complaint alleges that the company has not performed valuations of its stock.  *See, e.g.*, AC ¶ 42.  Although discovery will be needed to determine the Fair Market Value on the relevant dates, this does not preclude a finding that Madhu has sufficiently alleged an injury.

### ii.   The Amended Complaint Does Not Plausibly Allege a Breach of § 6.04 of the Plan

Madhu does not plausibly allege that Socure breached § 6.04 of the Plan by refusing to allow him to exercise his options using Carta on October 11, 2021.  *See* Pl's Opp'n at 14.  Section 6.04 provides, in pertinent part:

> Each Option . . . granted under the Plan shall be exercised . . . by notice to [Socure] or by such other method as provided in the Award Agreement or as the Committee may establish or approve from time to time.  The Exercise Price of shares purchased upon exercise of an Option granted under the Plan shall be paid in full in cash by the Participant pursuant to the Award Agreement; *provided, however*, that the Committee may (but shall not be required to) permit payment to be made (a) by tendering . . . previously acquired shares of Common Stock, (b) by a "net exercise" method . . . , or (c) such other consideration as the Committee deems appropriate and in compliance with applicable law . . . .

Dkt. No. 37-1 at § 6.04.

To plausibly allege that Socure breached § 6.04 by refusing to allow him to exercise using Carta, Madhu would need to plead that the compensation committee of Socure's Board "establish[ed] or approv[ed]" Carta as a method for exercising stock options.  *See* Dkt. No. 37-1 at § 6.04.  The Amended Complaint does not make that allegation directly.  Instead, the Amended Complaint alleges that Carta is "an application used by private companies, including Socure, for the management of equity investments, including the exercise of stock options."  AC ¶ 21.

Even if this general statement that Socure "used" the application for exercise could be read to allege that it was an "establish[ed] or approv[ed]" method of exercise, Madhu's claim still fails. Section 6.04 requires payment in cash or by alternative means permitted by the compensation committee. *See* Dkt. No. 37-1 at § 6.04. Madhu does not allege that he made any cash payment on October 11, 2021, nor does he allege that the Committee permitted—and that he made—payment by any of the alternative means listed in § 6.04. He therefore has not pleaded a plausible claim for breach of § 6.04.

### C.   Declaratory Judgment

Madhu's claim for declaratory relief must fail because the declarations Madhu seeks are precluded by the Amended Complaint's allegations and not appropriate subjects for declaratory relief. Because the Court's jurisdiction over this action is based on diversity, the "Declaratory Judgment Act—not state declaratory judgment law—provides the procedural mechanism for granting declaratory relief . . . ." *Cont'l Indus. Grp., Inc. v. Altunkilic*, No. 14-CV-790 (AT) (JLC), 2020 WL 3884312, at *10 (S.D.N.Y. July 1, 2020) (citing*, inter alia, Bruno v. Casella Waste Systems, Inc.*, 616 F. App'x 20, 21 n.2 (2d Cir. 2015) (summary order)); *see also Haagen-Dazs Shoppe Co. v. Born*, 897 F. Supp. 122, 126 n.2 (S.D.N.Y. 1995) (collecting cases). "The Declaratory Judgment Act, by its express terms, vests a district court with discretion to exercise jurisdiction over a declaratory action." *Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citing 28 U.S.C. § 2201(a)); *see also Adirondack Cookie Co. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94 (N.D.N.Y. 2012) ("The Declaratory Judgment Act 'confers a discretion on the courts rather than an absolute right upon the litigant.'" (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)).

In deciding whether to exercise this authority, district courts must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*,

411 F.3d at 389. The Court may also consider other factors, including "whether there is a better or more effective remedy" than a declaratory judgment. *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 360 (2d Cir. 2003)). "Courts generally reject a DJA claim when other claims in the suit will resolve the same issues." *EFG Bank*, 309 F. Supp. 3d at 99. Courts enjoy "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton*, 515 U.S. at 286.

Madhu's second cause of action seeks a declaration that (1) he "exercised his stock options on October 4, 2021 (or alternatively on October 11, 2021)," (2) "that Socure had no right to refuse to issue the shares of stock . . . and otherwise refuse to conduct a valuation to facilitate the exercise of those stock options," and (3) "that the Socure Board did not determine the fair market value of Socure common stock as of September 29, 2021 to be $16 per share, or if it did so it did not do so in good faith." AC ¶ 61.

The Amended Complaint's allegations preclude a declaration that Madhu exercised his stock options on October 4 or 11, 2021. The Amended Complaint recognizes that to exercise his options Madhu needed to provide Socure with an Exercise Notice and "payment of the aggregate Exercise Price as to all shares exercised." AC ¶ 15; *see also* Dkt. No. 37-2 at § 2(b). Where stock option agreements are involved, "precise compliance with the terms of the option is required before the sale is enforced." *Simon-Mills II*, 2017 WL 1191061, at *30.

Madhu's Amended Complaint alleges that he "stood ready, willing, and able to exercise" his options on October 4, 2011, but it does not allege that he actually sent the required Exercise Notice and payment on that date—only that he "informed [Socure] on that date of his intent to move forward." *See* AC ¶ 25. Madhu does not allege that he took steps to send the required notice and payment until October 11, 2021. *Id.* ¶ 28. Here, however, the Amended Complaint alleges that he attempted to exercise the options but was ultimately unable to because "the execute function on

Carta" had been disabled.  *Id.*  Madhu does not allege that he sent the required notice and payment—i.e., exercised—until October 26, 2021.  *Id.* ¶ 33.  Taking Madhu's allegations as true, he has not pleaded facts that would permit the Court to declare he validly exercised his options on October 4 or 11, 2021.[8]

This Court will exercise its discretion to dismiss Madhu's declaratory judgment claim for two additional reasons.  The declarations Madhu seeks all relate to past events.  However, "[d]eclaratory relief is intended to operate prospectively."  *Associated Elec. & Gas Ins. Servs. v. Elec. Power Sys., Inc.*, No. 5:14-CV-68, 2014 WL 12717669, at *7 (D. Vt. Dec. 23, 2014) (quoting *Adirondack Cookie*, 81 F. Supp. 2d at 94).  In addition, the issues raised will be decided in connection with Madhu's contract claims.  *See EFG Bank*, 309 F. Supp. 3d at 99 ("Courts generally reject a DJA claim when other claims in the suit will resolve the same issues.").  In short, a declaratory judgment would serve no useful purpose here.

### D.        Implied Covenant of Good Faith and Fair Dealing

Madhu asserts two claims for breach of the implied covenant of good faith and fair dealing.  His fourth claim is based on Socure's alleged conduct delaying and impeding Madhu from exercising his options.  This claim, while marginal, is adequately pleaded, because Madhu asserts that officers of the company acted to frustrate his exercise of his options.  His fifth claim alleges that Socure breached the implied covenant by its refusal to consent to the transfer of a portion of Madhu's stock options to a gift trust.  This claim fails because the parties' contracts prohibit such a transfer.

Delaware law recognizes an implied covenant of good faith and fair dealing in all contracts.  *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022).  The implied covenant "ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'"  *Id.*

---

[8] Because Madhu does not allege that he paid any amount on October 4 or 11, the Court does not need to decide whether that amount needed to include applicable taxes.

(quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). "Courts utilize the implied covenant to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated[,] and courts will invoke the implied covenant to imply terms when necessary to protect the reasonable expectations of the parties." *Id.* (citation and internal quotation marks omitted).

However, Delaware law does not permit use of the implied covenant "as an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Id.* at 1117 (internal quotation marks omitted). "Nor is the implied covenant to be used as a backstop to imply terms that parties failed to include but which could easily have been drafted." *Id.* When a contract is "truly silent" about an issue, and the contract's express terms "naturally imply certain corresponding conditions," the contracting parties "are entitled to have those terms enforced according to the reasonable expectations of the parties at the time of contracting." *Id.* (citing *Dieckman*, 155 A.3d at 361). "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'" *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (citation omitted). The implied covenant "thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborn Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). "In the Venn diagram of contract cases, the area of overlap is quite small." *Id.*

To sufficiently plead breach of the implied covenant, a complaint "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Baldwin*, 283 A.3d at 1117–18 (quoting *Sheehan v. AssuredPartner, Inc.*, No. CV 2019-0333-AML, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)). The party asserting a breach of the

implied covenant has the burden of proving "that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* (quoting *Dieckman*, 155 A.3d at 367). When determining the parties' reasonable expectations, courts analyze "whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose." *Id.* (quoting *Amirsaleh v. Bd. Trade N.Y.C.*, No. CIVA.2822-CC, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009)).

Madhu's fourth claim alleges that Socure breached the implied covenant by "unreasonably delaying" and "preventing" Madhu from exercising his stock options. AC ¶ 70. Specifically, Madhu alleges that Aronovitz and Levin told him in May 2021 that his intended exercise would subject him to an alternative minimum tax and that the proposed transfer to the gift trust would violate his obligation to offer Socure a right of first refusal. *Id.* ¶¶ 17–18; *see also* Pl's Opp'n at 23. Madhu's allegations that Aronovitz and Levin gave him bad information that the proposed transfer to the gift trust would violate the company's right of first refusal cannot support a claim for breach of the implied covenant. As explained below, the parties' agreement prohibits that type of transfer. Madhu therefore was not deprived of any contractual fruits. *See Baldwin*, 283 A.3d at 1116. And of course, to the extent that the claim rests on the fact that the tax advice was wrong, it is not a proper basis for a claim for breach of the implied covenant. There is nothing in the text of the parties' agreement that would support an implied duty for the company to provide Madhu with sound tax advice. *See Dunlap*, 878 A.2d at 441 (explaining that the implied covenant cannot be used "to create a free-floating duty . . . unattached to the underlying legal document'" (quoting *Glenfield Fin. Corp. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994))).

However, read in the light most favorable to him, Madhu plausibly alleges that Defendant's officers acted to "frustrate[] the overarching purpose of the contract by taking advantage of [its]

position to control implementation of the agreement's terms." *Dunlap,* 878 A.2d at 442 (internal

quotation marks omitted).  Madhu alleges that the bad tax advice provided to him by Aronovitz and

Levin was a delay tactic.  Madhu also points to Aronovitz's statements in October 2021 that the May

2021 valuation of $1.98 per share was "only good for six months"—which Madhu alleges was

incorrect—and that the company would have a better sense of the fair market value in two to three

weeks—which Madhu alleges was intended to delay his exercise.  AC ¶¶ 26–27.  Madhu plausibly

pleads conduct that supports a claim for breach of the implied covenant on this basis.

Madhu's fifth cause of action alleging breach of the implied covenant based on Socure's

refusal to permit Madhu to transfer a portion of his options to a gift trust fails because it runs

contrary to the express language of the pertinent agreement.  The parties' agreement explicitly

prohibits lifetime transfers.  Dkt. No. 37-2 at § 5(a) ("This Option may not be transferred in any

manner otherwise than by will or by the laws of descent or distribution . . . .").

Although Madhu points to § 11.26 of the Plan as "arguably" permitting transfer, he provides

no argument or explanation why that provision would permit the transfer.  *See* Pl's Opp'n at 10–11.

In any case, that section is "[s]ubject to any additional limitation on transfer of any Award under this

Plan or an Award Agreement . . . "  Dkt. No. 37-1 at § 11.26(a).  As stated above, the Option

Awards expressly prohibit the proposed transfer.  Dkt. No. 37-2 at § 5(a).  This precludes Madhu's

fifth claim for breach of the implied covenant.  *Airborne Health*, 984 A.2d at 146 ("The implied

covenant does not apply when 'the subject at issue is expressly covered by the contract.'" (quoting

*Dave Greytak Enters. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992))).  Madhu cannot

use the implied covenant to re-write a contract term he now regrets.  *See Nemec v. Shrader*, 991 A.2d

1120, 1126 (Del. 2010) ("[Courts] must assess the parties' reasonable expectations at the time of

contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he

now believes to have been a bad deal.  Parties have a right to enter into good and bad contracts, the law enforces both." (citation omitted)).

## IV.    LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  It is true that leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  The Court cannot conclude that amendment of the complaint to replead Plaintiff's second cause of action would be futile.  Plaintiff has not yet had the opportunity to amend the complaint with the benefit of a ruling from the Court with respect to that issue.  "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).  On the other hand, it would be futile for Plaintiff to replead his fifth cause of action, as it is expressly controverted by the terms of the relevant agreements.  Plaintiff is therefore granted leave to file an amended complaint to address the deficiencies identified here with respect to Plaintiff's second cause of action, but not his fifth.  Any amended complaint must be filed and served no later than fourteen days from the date of this order.

## V.        CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED as to Madhu's

second cause of action, for declaratory judgment, and fifth cause of action, for breach of the implied

covenant of good faith and fair dealing.  The remainder of Defendant's motion to dismiss is

DENIED.  The Clerk of Court is directed to terminate the motion at Dkt No. 35.

SO ORDERED.

Dated:  September 22, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

23