UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/16/2024

---------------------------------------------------------- X
                                      :

SUNIL MADHU,                             :
                                      :

                       Plaintiff,   :

                                      :

                  -v-                 :                1:22-cv-682-GHW
                                      :

SOCURE INC.,                      :            MEMORANDUM
                                      :        OPINION & ORDER
                       Defendant.   :

                                      :
---------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      For years now, Sunil Madhu has been trying to exercise millions of dollars' worth of options to acquire the stock of Socure Inc., the company that he founded. It has not gone smoothly. The company did not accept his requests to exercise his options in 2021 because the company did not believe that he had tendered enough cash to satisfy his tax obligations. In 2023, the company refused his request to "net exercise" his options entirely, notwithstanding an agreement that permitted him to do so in part. Mr. Madhu claims that by refusing to issue him shares following his attempts to exercise his options, the company breached its contract with him. Mr. Madhu also claims that by throwing up roadblocks to his attempts to exercise the options, the company breached the implied covenant of good faith and fair dealing. Because Mr. Madhu has adequately pleaded that the company frustrated the fruits of his agreements with the company by, among other things, failing to provide a timely valuation of the company's stock and preventing him from exercising rights that he had negotiated in one of his contracts, his claim for breach of the implied covenant of good faith and fair dealing may proceed. Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

### A.     Facts[1]

#### 1.     The Documents Governing Mr. Madhu's Stock Options

Sunil Madhu founded Socure Inc. ("Socure" or the "Company"), a company that provides digital identification and fraud solutions, in 2012.  Dkt. No. 62 (the "Second Amended Complaint" or "SAC") ¶¶ 2, 14.  He left the Company in February 2019.  *Id.* ¶ 3.  When he left Socure, Mr. Madhu and the Company entered into a "Separation Agreement," which is described in more detail below.  *Id.* ¶¶ 3–17; *see* Dkt. 62-4, Ex. D (the "Separation Agreement").

At the time that Mr. Madhu left the Company, he held options to purchase nearly ten million shares of the Company's common stock.  *Id.* ¶¶ 3, 16–17.  The options were issued pursuant to two option awards.  *Id.* ¶¶ 16–17.  The first set of options were awarded to Mr. Madhu on November 17, 2014, and gave him the right to purchase up to 6,758,421 shares of the Company's common stock at an exercise price of $0.07 per share (the "First Option Award").  *Id.* ¶ 16; *see* Dkt. No. 62-2, Ex. B (First Option Award).  The second set of options were awarded to him on June 1, 2018, and gave him the right to purchase up to 3,221,211 shares of the Company's common stock at an exercise price of $0.11 per share (the "Second Option Award," and together with the First Option Award, the "Option Awards").  *Id.* ¶ 17; *see* Dkt. No. 62-3, Ex. C (Second Option Award).

Because this lawsuit stems from Mr. Madhu's various attempts to exercise his options, the Court believes that it is useful to the reader to lay out the relevant provisions in the documents that govern his Option Awards.  Those are:  the First and Second Option Awards; the Omnibus Incentive Plan (the "Plan"), which is incorporated by reference in its entirety into the terms of the

---

[1] Unless otherwise noted, the facts are drawn from the Second Amended Complaint (the "SAC").  Dkt. No. 62.  The facts are accepted as true for purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Option Awards, Dkt. No. 62-1, Ex. A (the Plan); and the Separation Agreement.  As the reader will see, these documents contain several overlapping provisions that must be analyzed in order to understand the two principal questions raised by this motion:  what Mr. Madhu must do in order to exercise his options, and what the Company can do to reassure itself that any tax withholding obligations with respect to the exercise of options awards are satisfied.  The Court focuses on the relevant provisions of each of the governing documents below.

### a.     The Plan

The Plan establishes the general terms and conditions for the issuance of incentive awards at the Company—including the issuance of options.  The Plan is governed by the law of the State of Delaware.  Plan § 11.10.  The Plan is to be administered by a committee of the Company's board of directors, which "shall have exclusive and final authority in each determination, interpretation or other action affecting the Plan and its Participants."  *Id.* § 3.01(a).  The committee is authorized to grant options to Plan participants.  *Id.* § 6.01(a).  The terms of each award of options are to be set forth in the agreement awarding the options.  *Id.*  The rights of an option holder to exercise his options may be established in the award agreement, "as determined by the Committee at the time of grant."  *Id.* § 6.03(a).

One section of the Plan, headed "Exercise Procedures," describes the default procedures for the exercise of options.  *Id.* § 6.04.  That section outlines the type of notice required to exercise an option award:  "Each Option . . . granted under the Plan shall be exercised . . . by notice to the Corporation *or* by such other method as provided in the Award Agreement *or* as the Committee may establish or approve from time to time."  *Id.* (emphasis added).  Because the Plan uses the word "or" here, it establishes alternative, non-exclusive means by which an option may be exercised.  The provision clearly permits the Company to mandate that a participant exercise his options in a way specified in an award agreement.  But, as will be described later, the drafters of Mr. Madhu's award

agreements in their wisdom did not require that he exercise his options in a specific way. Instead, they wrote that he "may" exercise his options in the manner described in his award agreements. As a result, Mr. Madhu contends that he is entitled to exercise his options simply "by notice to the Corporation," the first method of exercise permitted by the Plan.

The "Exercise Procedures" section of the Plan also lays out default rules for payments to exercise an option. The Plan establishes that the default payment method is cash, but that alternative payment methods can be adopted in each option award agreement.

> The Exercise Price of shares purchased upon exercise of an Option granted under the Plan shall be paid in full in cash by the Participant pursuant to the Award Agreement; *provided, however*, that the Committee may (but shall not be required to) permit payment to be made (a) by tendering (either by actual delivery or attestation) previously acquired shares of Common Stock, (b) by a "net exercise" method under which the Corporation reduces the number of shares of Common Stock issued upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate Exercise Price, or (c) such other consideration as the Committee deems appropriate and in compliance with applicable law . . . .

*Id.*

The Plan defines "Fair Market Value" as:

> Fair Market Value means, on any date, (i) the closing sale price of a share of Common Stock as reported on an established stock exchange on which the Common Stock is regularly traded on such date or, if there were no sales on such date, on the last date preceding such date on which a sale was reported; or (ii) if shares of Common Stock are not listed for trading on an established stock exchange, Fair Market Value shall be determined by the Committee in good faith and otherwise in accordance with Section 409A of the [Internal Revenue] Code [of 1986, as amended], and any regulations and other guidance thereunder.[2]

*Id.* § 2.18. As described in the Court's September 22, 2023 opinion (the "2023 Opinion"), Dkt. No. 45, Plaintiff takes the position that this definition should be read to impose on the committee an

---

[2] Section 409A of the Internal Revenue Code governs the inclusion in gross income of deferred compensation under nonqualified deferred compensation plans. 26 U.S.C. § 409A.

obligation to calculate the fair market value of the Company's shares on any given date. 2023 Opinion at 13–14.

The Plan contains a separate section that addresses the tax consequences of the exercise of options. Appropriately, that section is headed "Taxes." Plan § 11.05. The Plan permits the Company to withhold taxes payable as a result of an award "if the Committee deems it necessary or desirable." *Id.* To enforce that right, the Plan permits the Company to defer the issuance of shares "upon the exercise" of an option award until the Company has been indemnified to its satisfaction for those withholding obligations.

> The Corporation shall be entitled, if the Committee deems it necessary or desirable, to withhold (or secure payment from the Participant in lieu of withholding) the amount of any withholding or other tax required by law to be withheld or paid by the Corporation with respect to any amount payable or shares issuable under such Participant's Award . . . and the Corporation may defer payment or issuance of the . . . shares upon exercise . . . of an Award unless indemnified to its satisfaction against any liability for any such tax.

*Id.* The Plan contemplates the exercise of an option and the payment of withholding taxes with respect to the exercise as separate events. Following the exercise of an option, the Company can choose not to issue the resulting shares until the indemnification requirement is satisfied.

The Plan allows the Company to permit an option holder to satisfy his withholding tax obligations in a number of ways. For purposes of this motion, two points are particularly significant. First, the Plan contains separate sections for payment of the exercise price and the satisfaction of the withholding tax obligation (§ 6.04 and § 11.05, respectively). And, second, while the Plan permits an option holder to satisfy his withholding taxes by setting aside common shares that would otherwise have been issued, the Plan uses different language to describe that right in the "Taxes" section than in the "Exercise Procedures" section of the Plan.

> The amount of such withholding or tax payment shall be determined by the Committee and shall be payable by the Participant at such time as the Committee determines in accordance with the following rules: (a) The Committee may permit the Participant to elect to meet his or her withholding requirement (i) by having

> withheld from such Award at the approximate time that number of shares of Common Stock, rounded down to the next whole share, whose Fair Market Value is equal to the amount of withholding tax due, (ii) by direct payment to the Corporation in cash of the amount of withholding taxes required to be withheld with respect to such Award or (iii) by a combination of shares and cash.

Plan § 11.05.  Section 11.05(a)(i) of the Plan permits an option holder to satisfy his tax obligations by withholding shares of stock with a fair market value equivalent to the withholding obligation. However, in the "Taxes" section of the Plan, unlike in Section 6.04, this process of withholding shares of equivalent value to the option holder's payment obligation is not described as a "net exercise."

### b.  The First Option Award

The First Option Award was executed on November 16, 2014.  It awarded Mr. Madhu options to purchase up to 6,758,421 shares of the Company's common stock at an exercise price of $0.07 per share.  The First Option Award was "issued under and governed by the terms and conditions of the Plan . . . ."  First Option Award at 2.  Like the Plan, the First Option Award is governed by Delaware law.  *Id.* § 13(c).

Section 2 of the First Option Award, entitled "Exercise of Options," describes the method for exercising the options.  Section 2(b) describes that method as follows:

> (b) <u>Method of Exercise</u>.  The Participant *may* exercise the Option by delivering an exercise notice to the Chief Executive Officer of the Corporation in a form approved by the Corporation (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Corporation.  The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all shares exercised.  This Option shall be deemed to be exercised upon receipt by the Corporation of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

First Option Award § 2 (emphasis added).  Note that the drafter of the First Option Award used the word "may" when describing this method of exercising the options.  Mr. Madhu argues— correctly—that because the drafter of the First Option Award used permissive language ("may"),

rather than mandating the use of a particular form of "Exercise Notice" ("shall"), he can exercise his options either by using the specified form of exercise notice or by alternative means as described in the Plan.

Section 3 of the First Option Award, entitled "Method of Payment," follows immediately after the section entitled "Exercise of Option."  It states the following:

> <u>Method of Payment</u>.  If the Participant elects to exercise the Option by submitting an Exercise Notice under Section 2(b) of this Agreement, the aggregate Exercise Price (as well as any applicable withholding or other taxes) shall be paid by cash or check; *provided*, *however*, that the Committee may consent, in its discretion, to payment in any of the following forms, or a combination of:
>
> (a)  cash or check;
>
> (b)  a "net exercise" (as described in the Plan) or such other consideration received by the Corporation under a cashless exercise program approved by the Corporation in connection with the Plan;
>
> (c)  surrender of other Shares owned by the Participant which have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares and any applicable withholding; or
>
> (d) any other consideration that the Committee deems appropriate and in compliance with applicable law.

First Option Award at § 3.  The "Exercise Price" referred to here is a defined term from the Plan, which means "with respect to Options, the amount established by the Committee in the Award Agreement . . . which is required to purchase each share of Common Stock upon exercise of the Option . . . ."  Plan § 2.17.

Three points should be highlighted here.  First, the award document distinguishes between the payment for the "Exercise Price" for the exercise of options and the payment of withholding taxes.  That the payment of withholding taxes is different from the payment of the exercise price is made clear by the fact that withholding tax payment obligation is referenced in a parenthetical apart from the "Exercise Price."  Second, the First Option Award establishes a default rule that payment

for both the Exercise Price and withholding taxes must be in cash.  But the committee may permit the payment of either amount by alternative means, including the method described in Section 3(b).

Third, Section 3(b) refers to two alternatives methods of cashless exercise:  (1) "'net exercise' (as described in the Plan)" or (2) such other consideration received by the Company under a cashless exercise program approved by the Company in connection with the Plan.  Not all cashless consideration is treated a "net exercise."  If it were, there would be no need for the clause designated as (2) above.  Clause (1) seems to refer to the "net exercise" mechanism described in Section 6.04(b) of the Plan, which also uses the term "net exercise."  Clause (2) refers to a category of cashless exercise mechanism approved by the Company that is not a "net exercise," and, therefore, may be read to refer to the cashless exercise mechanism established to satisfy withholding tax payment obligations described in Section 11.05 of the Plan.

Section 8 of the First Option Award is headed "Withholding."  Unsurprisingly, it contains provisions related to tax withholding with respect to Mr. Madhu's options.  Very surprisingly, given the fact that this case is about the payment of Mr. Madhu's withholding tax obligations upon exercise of his options, his lawyers have made no reference to this section of the agreement throughout the course of the litigation or the communications leading up to the litigation that have been presented to the Court.  The Court flagged the existence of the provision during a conference that it scheduled for that purpose while this motion was pending.  Mr. Madhu's litigation counsel appears to have noted its applicability to this dispute for the first time during that conference.[3]  The

---

[3] Transcript of March 22, 2024 Conference, Dkt. No. 85 ("March 2024 Tr."), at 6:8–8:1 ("THE COURT:  So can I just hear briefly, do you have a view, counsel, about 8(c) and whether it has any impact on the parties' positions here?  First, counsel for plaintiff. . . .  MR. GREENSPAN:  . . . .  So, as I read this, 8(c), although you're correct is not addressed in our briefing, is fully consistent with our argument, in that we believe that the net exercise right, even though the word net exercise only appears in the provision of the plan relating to payment of the exercise price, we believe a financially equivalent cashless exercise method appears in the section of the plan relating to taxes.  And so that's our fundamental argument, that when he was promised in the separation agreement that he would be entitled to use net exercise, as described in the plan, that that encompassed both of those, both the exercise price and the withholding taxes.  And then 8(c), as I am just looking again at it now, subject to rules prescribed by the committee, participant shall have the right to

8

Court highlights this blind spot here because the parties' disputes will not make complete sense to the reader unless she understands that the plaintiff's lawyers seem not to have been aware of Section 8 of the First Option Award until very recently.

Section 8 of the First Option Award establishes that a committee of the board is to calculate the amount of withholding taxes due upon the exercise of options: "The Committee shall determine the amount of any withholding or other tax required by law to be withheld or paid by the Corporation with respect to any income recognized by the Participant with respect to the Option Award." First Option Award § 8(a). The option holder has to satisfy the withholding tax obligations. *Id.* § 8(b).

The First Option Award specifically provides Mr. Madhu the right to satisfy his tax obligations with respect to options awarded under it by withholding shares, rather than by paying for the withholding taxes in cash.

> (c)  Subject to any rules prescribed by the Committee, the Participant shall have the right to meet any withholding requirement (i) by having withheld from this Award at the appropriate time that number of whole shares of common stock whose fair market value is equal to the amount of any taxes required to be withheld with respect to such Award, (ii) by direct payment to the Corporation in cash of the amount of any taxes required to be withheld with respect to such Award or (iii) by a combination of shares and cash.

*Id.* § 8(c). This section of the First Option Award tracks the language of Section 11.05(a) of the Plan, which expressly permits the Company to include such a provision in any award agreement.[4]

---

elect to meet any withholding requirement, which is another way of saying withholding taxes, by having withheld from this award at the appropriate time that number of whole shares of common stock whose fair market value is equal to the amount of any taxes required to be withheld with respect to that award. And then, alternatively, direct payment of cash or some combination. So I would say that you are correct in identifying this section as relevant, and I believe 8(c), subpart (i), is substantially equivalent to the language in the plan, Section 11.05, that talks about the opportunity to have shares withheld from distribution, that would otherwise be distributed to an option holder upon exercise, have shares withheld such that the number of shares, multiplied by their fair market value, is equal to the amount of the taxes that are required to be withheld. So just to sum up, I think it is relevant. We apologize for not having brought it to the Court's attention, but the Court has correctly noted it, and I think it's completely consistent with our argument in the briefing.").

[4] The only substantive difference from the language outlined in Section 11.05(a) of the Plan is that Section 8(c) of the First Option Award does not capitalize the term "Fair Market Value."

The final provision of the First Option Award that merits attention here is Section 13(a), "Notices." It requires, among other things, that all notices related to the options be delivered in writing:

> <u>Notices</u>. All notices, requests, deliveries, payments, demands and other communications which are required or permitted to be given under these Terms and Conditions shall be in writing and shall be either delivered personally or sent by registered or certified mail, or by private courier, return receipt requested, postage prepaid to the parties at their respective addresses set forth herein, or to such other address as either shall have specified by notice in writing to the other. Notice shall be deemed duly given hereunder when delivered or mailed as provided herein.

*Id.* § 13(a).

### c.    The Second Option Award

The Second Option Award was granted on June 1, 2018. It awarded Mr. Madhu options to purchase up to 3,221,211 shares of the Company's common stock at an exercise price of $0.11 per share. The Second Option Award was "subject to the terms and conditions" set forth in the Plan. Second Option Award at 1. Like the Plan and the First Option Award, the Second Option Award is governed by Delaware law. *Id.* § 15(e). Several terms of the Second Option Award are substantially identical to those in the First Option Award. But there are also important differences between them.

To begin, the similarities: The Second Option Award contains a "Method of Exercise" provision, Section 2(b), that is substantively identical to the equivalent provision in the First Option Award. The Second Option Award also describes the "Method of Payment" for the exercise price of options (as well as any applicable withholding or other taxes) using the same language as in the First Option Award. Second Option Award § 5. And the Second Option Award contains the same language as the First Option Award requiring that notices be provided to the Company in writing. *Id.* § 15(a).

There is one meaningful difference between the First and Second Option Awards:  The Second Option Award does not contain language equivalent to Section 8(c) of the First Option Award.  The Second Option Award does not expressly permit Mr. Madhu to offset tax obligations by withholding shares upon the exercise of options.

Instead, the Second Option Award contains a tax withholding provision that empowers the Company to refuse any exercise unless it is satisfied with the arrangements made by the option holder to satisfy the tax obligations.

> Tax Withholding.  The Participant agrees to make appropriate arrangements with the Corporation for the satisfaction of all Federal, state, local and non-U.S. income and employment tax withholding requirements applicable to the Option exercise.  The Participant acknowledges and agrees that the Corporation may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

*Id.* § 10(a).

Several aspects of this language should be flagged for the reader.  First, the calculation of the withholding tax obligation is not a unilateral process:  the option holder agrees to make arrangements with the Company regarding the payment; and the Company is empowered to refuse an exercise.  Second, the language points to the timing of delivery of the payment:  the Company can refuse to honor a request if payment is not delivered *at the time of exercise.*  Third, the Second Option Award uses the term "amounts" when referring to the payment of taxes.  That is consistent with the default rule under the Plan that tax withholding obligations be satisfied in cash.  And fourth, this provision modifies the Plan's rule regarding what the Company can do if the withholding arrangements are not satisfactory.  Under the Second Option Agreement, the Company can refuse to honor the exercise *and* not issue the option shares.  The Plan, by contrast, gives the Company the right to withhold issuance of shares upon exercise, but does not condition the exercise itself on the Company's satisfaction with the withholding arrangements.  *Compare* Plan § 11.05, *with* Second Option Award § 10(a).

11

To sum up to this point:  Both Mr. Madhu's First Option Award and the Second Option Award required that he pay cash to pay the exercise price for his options.  That is because neither modified the default rule established in Section 6.04 of the Plan, which required that payments be made in cash unless otherwise provided in an award agreement.  Mr. Madhu did not have to pay in cash for withholding tax obligations with respect to the First Option Agreement because Section 8(c) gave him the right to satisfy the obligations by cashless offset.  Mr. Madhu did have to pay in cash for withholding tax obligations with respect to the Second Option Agreement, because that agreement did not modify the default rule established in Section 6.04 of the Plan.

### d.      The Separation Agreement

Mr. Madhu left the company in February 2019.  On February 13, 2019, he entered into a separation agreement with the Company (the "Separation Agreement").  Dkt. 62-4, Ex. D (Separation Agreement).  Unlike the other documents just reviewed by the Court, the Separation Agreement is governed by New York law.  Separation Agreement § 28.

The Separation Agreement addressed a number of issues, the central one of which, for purposes of this dispute, relates to Mr. Madhu's options.  Separation Agreement § 2.  The Separation Agreement accelerated the vesting of the options granted under the Second Option Award.  The Separation Agreement also contained language regarding the method that Mr. Madhu could employ to pay for his shares:

> The exercise of Mr. Madhu's vested options and shares shall continue to be governed by the terms and conditions of the Company's Stock Agreements; provided however, that the Company hereby agrees to permit Mr. Madhu to exercise Option 1 and/or Option 2 by payment in the form of a "net exercise" method as described in the Plan.

*Id.*  Both parties agree that this provision allows Mr. Madhu to pay the exercise price for his shares using the "net exercise" method.  They dispute the issue resolved by the Court in this opinion:  does this language permit Mr. Madhu to satisfy withholding tax obligations in a cashless manner?

12

With the pertinent provisions of the relevant contracts in hand, the Court turns to the Second Amended Complaint's narrative of the dispute that led to this litigation.

### 2.    Mr. Madhu's Efforts to Exercise His Stock Options in October 2021

On May 24, 2021, Mr. Madhu communicated with Avi Aronovitz, Socure's Chief Financial Officer, and Avida Levin, Socure's Senior Vice President Legal, regarding his "intent to exercise his stock options . . . ." SAC ¶ 24. Mr. Madhu also informed the pair he wanted to transfer some of the shares he would receive after exercising his options to a family trust and special purpose vehicle ("SPV"). *Id.* Mr. Madhu alleges that the Company responded with what he describes as a series of "roadblocks." Mr. Madhu was informed that if he exercised his options, he would be subject to an alternative minimum tax. *Id.* ¶ 25. He was also told that transferring the stock to the trust and SPV would violate his obligation to offer Socure the right of first refusal prior to any transfer of his shares in the company. *Id.* Mr. Madhu alleges that both of those assertions were wrong, but nonetheless "they required Madhu to consult with legal and tax experts costing him time and money." *Id.*

Mr. Madhu decided to move forward with his plan to exercise his options. *Id.* ¶ 26. "That plan could not be accomplished immediately because Madhu needed to gather the funds necessary to pay not only the exercise price for the shares, but also the ordinary income tax he understood would have to be paid at the time of the exercise of his options." *Id.*

Mr. Madhu alleges that the Compensation Committee determined in May 2021 that Socure's common stock was $1.98 per share. *Id.* ¶ 27. In anticipation of his anticipated exercise, Mr. Madhu ran a simulation on Carta—an application used by some private companies, including Socure, for the management of equity investments—to determine the amount of money required to exercise his options and pay the applicable taxes on his realized gains. *Id.* ¶¶ 28–31. For Mr. Madhu's First Option Award, the cost to acquire 6,758,421 shares at $0.07 per share was $473,089.47, the gain on

those shares at a fair market value of $1.98 per share was $12,908,584.11, and the taxes owed on that gain totaled $5,563,804.59.  *Id.* ¶ 29.  For the Second Option Award, the cost to acquire 3,221,211 shares at $0.11 per share was $354,333.21, the gain on those shares at a fair market value of $1.98 per share was $6,023,664.57, and the taxes owed on that gain totaled $2,601,017.18.  *Id.* ¶ 30.  Taken together, Mr. Madhu determined that he needed $8,992,224.45 to exercise his stock options, consisting of $827,422.68 for the exercise price and $8,164,821.77 for taxes.  *Id.* ¶ 31.

On October 4, 2021, Mr. Madhu had amassed the $8,992,224.45 that he believed he needed to exercise his options.  *Id.* ¶ 32.  He "stood ready, willing and able to exercise his stock options." *Id.*  Mr. Madhu does not allege that he communicated with anyone at the Company regarding the appropriate calculation of his withholding tax obligations to this point.  Mr. Madhu informed Mr. Aronovitz "of his intent and desire" to move forward with the exercise of his options.  *Id.* Mr. Aronovitz responded that the Company "would not let him exercise his options that day and would not issue and deliver shares of stock to Madhu upon exercise of his options at a fair market value of $1.98 per share" because that valuation "was only good for six months."  *Id.* ¶ 33. Mr. Madhu asserts that the statement was false because the valuation had been conducted less than 6 months before.  *Id.*  However, Mr. Aronovitz told Mr. Madhu that Socure would "have a better sense of the [fair market value] in 2-3 weeks."  *Id.* ¶ 34.

"Nonetheless, Madhu decided to go forward with the exercise of his options using the Carta platform, at the fair market value of $1.98 per share . . . ."  *Id.* ¶ 35.  On October 11, 2021, Mr. Madhu tried to exercise his options using Carta.  *Id.*  Mr. Madhu discovered that he could not exercise his options on Carta because Socure had disabled the "execute" function on the site.  *Id.*

Mr. Madhu was later told that Mr. Aronovitz's statements about the uncertainty of the $1.98 per share valuation were informed by the fact that Socure had entered into a non-binding term sheet with a group of investors to inject $450 million into Socure just days before.  *Id.* ¶ 36.  That non-

binding term sheet anticipated that the investors would acquire shares of Socure preferred stock at a value of $16 per share.  *Id.*; *see* Dkt No. 62-5, Ex. E.  It also provided that there "may be a secondary transaction (expected to be a tender offer) pursuant to which the investors would purchase existing shares of capital stock from the holders thereof at the same price as the preferred stock investment, or $16 per share."  SAC ¶ 36.

Mr. Madhu claims that the Company's failure to determine the fair market value of the shares at the time that he wanted to exercise his options violated Section 2.18 of the Plan.

A series of "back-and-forth" communications with the Company about the exercise of his options did not yield the result that Mr. Madhu sought.  *Id.* ¶ 40.  So Mr. Madhu acted.  On October 26, 2021, Mr. Madhu sent completed exercise forms together with checks for the exercise price— based on the $1.98 per share valuation—to what he believed was Socure's New York address by FedEx.  *Id.* ¶ 40.  At the same time, he emailed Mr. Aronovitz the forms and photocopies of the checks.  *Id.* ¶ 41.  Mr. Aronovitz replied that Socure had moved its office to Nevada, and Mr. Madhu later received confirmation from FedEx that his package had been redirected and delivered to Socure's Nevada address on October 28, 2021.  *Id.*  Later, on October 31, 2021, Mr. Madhu sent Socure checks totaling $8,164,821.77 in payment for his tax liability.  *Id.* ¶ 42.  Socure did not issue any shares of stock and did not cash Mr. Madhu's checks.  *Id.*  Mr. Madhu contends that "his actions on October 26, 2022 constituted the exercise of his stock options . . . ."  *Id.*  He complains that the Company did not issue him shares as a result of his exercise, notwithstanding the Company's disagreement regarding his calculation of the withholding tax due.

Around the second week of November 2021, after Socure's financing transaction was finalized, it reenabled the execute function on Carta.  *Id.* ¶ 48.  Mr. Madhu then attempted to use Carta to exercise of his options.  *Id.*  However, Carta displayed the fair market value of the common stock as "price in flux."  *Id.*  As of February 23, 2022, Carta listed Mr. Madhu's attempted

November 2021 exercise as "pending" and showed the fair market value of the common stock as $8.72 per share. *Id.* ¶ 49.

### 3.      Mr. Madhu Attempts a "Net Exercise" in July 2023

Mr. Madhu alleges that he attempted to exercise his stock options again in July 2023. At that point, this case was pending, and both Mr. Madhu and the Company had retained counsel. "On or about July 20, 2023," Mr. Madhu's counsel informed the Company's outside litigation counsel that Mr. Madhu "wanted to exercise his options forthwith using the 'net exercise' method for payment of both the exercise price and the applicable taxes." *Id.* ¶ 52. The Second Amended Complaint alleges that Mr. Madhu's counsel asserted that he had the right to do so "in accordance with the provisions of the Stock Option Agreements and his Separation Agreement." *Id.*

The Company's counsel responded to Mr. Madhu on July 31. The Company took the position that "under the Stock Option Agreements and the Separation Agreement, Madhu was entitled to use the 'net exercise' method for payment of the exercise price but *not* for payment of the applicable taxes." *Id.* ¶ 54. In this series of communications, Mr. Madhu's counsel never invoked Section 8(c) of the First Option Agreement, and relied instead entirely on their interpretation of the Separation Agreement. The Company's counsel stated its view that it "believed" that the Separation Agreement did not provide Mr. Madhu the right to satisfy his withholding obligations through "net exercise" in later communications, including a letter submitted to the Court. *Id.* ¶ 53.

Mr. Madhu alleges that the Company's position regarding the scope of his right to satisfy his withholding tax obligations in a cashless manner is "erroneous (and perhaps knowingly erroneous) and inconsistent with the provisions of the Stock Option Agreements and Madhu's Separation Agreement." *Id.* ¶ 53.

Mr. Madhu asks the Court to find that his counsel's communication that Mr. Madhu "wanted to exercise his options forthwith" itself constituted an exercise of the options,

notwithstanding the lack of any written notice to the Company or any agreement regarding the scope of the withholding obligations. He asserts that is feasible because the Company's counsel's statements regarding the Company's position rendered any attempt by him to exercise his options formally "futile." *Id.* ¶ 54.

> **B.    Procedural History**

This is the second motion to dismiss that the Court has addressed in this case. On September 22, 2023, the Court issued an opinion granting in part and denying in part the defendant's first motion to dismiss. *See* 2023 Opinion. In that opinion, the Court held that Mr. Madhu had plausibly alleged a breach of § 2.18 of the Plan based on Socure's alleged failure to determine the fair market value of its common stock when he requested a valuation in October 2021. The Court granted the defendant's motion with respect to Mr. Madhu's claim that the Company breached § 6.04 of the Plan by refusing to let Mr. Madhu exercise his options using the Carta system on October 11, 2021. The Court also dismissed Mr. Madhu's claim for declaratory judgment that he exercised his options on either October 4 or 11, 2021 because he had not pleaded that he scrupulously followed the exercise procedure established in the relevant agreements. The Court denied Socure's motion to dismiss Mr. Madhu's claims for a breach of the implied covenant of good faith and fair dealing insofar as he pleaded that the Company had impeded his ability to exercise his contractual rights. But the Court granted the motion with respect to Mr. Madhu's claim that Socure's refusal to consent to the transfer of a portion of Madhu's stock options to a gift trust violated the implied covenant. *Id.* at 18–22.

The Court granted Mr. Madhu leave to amend his complaint "to address the deficiencies identified here with respect to Plaintiff's second cause of action, but not his fifth." 2023 Opinion at 22. In other words, the Court granted Mr. Madhu leave to replead all of the claims that were dismissed other than the claim that the Company breached the implied covenant of good faith and

fair dealing when it denied him the right to transfer options to a family trust. Any amended complaint was due within 14 days after the issuance of the opinion.

On November 3, 2023, having missed the deadline for leave to amend provided in the Court's order, Mr. Madhu moved for leave to file a second amended complaint. Dkt. No. 54. After the Court held a pre-motion conference with the parties, Socure agreed to grant Mr. Madhu the opportunity to file an amended complaint. Dkt. 61 ("Without waiver of, or prejudice to, any of its rights relating to or arguments against the amendments in the proposed SAC, Defendant Socure Inc. consents to Mr. Madhu's filing of the SAC.").

On November 20, 2023, Mr. Madhu filed the Second Amended Complaint. *See* Dkt. Nos. 62 to 62-5. In it, Mr. Madhu asserts six causes of action. SAC at 21–28. Mr. Madhu asserts that Socure breached its contractual obligations to him by (1) failing to issue shares after Madhu exercised his options on October 26, 2021, and (2) failing to determine the fair market value of his shares after October 26, 2021 if the fair market value of Socure's common stock was not $1.98 per share on October 26, 2021. *Id.* ¶¶ 64–70, 78–84 (Counts One and Three). Mr. Madhu also claims that Socure breached the Option Awards by refusing to let him exercise his options on October 4, 2021 using Carta and seeks damages, but not specific performance. *Id.* ¶¶ 78–84 (Count Three). Mr. Madhu claims that Socure breached the Option Awards and Separation Agreement by refusing to let him "net exercise" his withholding tax and seeks specific performance and damages. *Id.* ¶¶ 71–77, 85–90 (Counts Two and Four). Finally, Mr. Madhu claims that the Company breached the implied covenant of good faith and fair dealing because the Company (1) provided Mr. Madhu with false and misleading information in 2021, (2) disabled Mr. Madhu's ability to effect an online exercise on Carta, (3) failed to determine in good faith the fair market value of his shares in October 2021, (4) failed to deliver the shares or engage with Mr. Madhu after he transmitted a notice of

exercise along with payment on October 26, 2021, and (5) refused to permit Mr. Madhu to "net exercise" his options in July 2023. *Id.* ¶¶ 91–104 (Count Six).

On December 12, 2023, Socure filed this motion to dismiss the Second Amended Complaint. Dkt. No. 65 ("Mot."); Dkt. No. 66 ("Def's Mem."); *see also* Dkt. No. 67 (declaration with exhibits). Plaintiff filed his opposition on January 12, 2023. Dkt. No. 73 ("Opp'n"). On January 26, 2024, Socure filed its reply. Dkt. No. 74 ("Reply"). On March 22, 2024, the Court held a telephonic conference and ordered the parties to address whether Section 8(c) of the First Option Award affects the parties' respective positions.[5] Dkt. No. 82. Each party submitted an supplemental brief in response. Dkt No. 83 ("Pl's Supp."); Dkt. No. 84 ("Def's Supp.").

In this motion, Socure asks the Court to dismiss Mr. Madhu's claims in Counts Three and Five for breach of contract and breach of the implied covenant of good faith and fair dealing based on his alleged attempt to exercise his options on October 4, 2021. Def's Mem. at 25. Socure also asks the Court to dismiss Mr. Madhu's claims in Counts One and Three for breach of contract based on his alleged exercise of the stock options on October 26, 2021. *Id.* Finally, Socure asks the Court to dismiss Madhu's claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on his attempts to net exercise his tax liability in July 2023 in Count Two, Three, and Six. *Id.* Socure does not ask the Court to dismiss the claims that survived the first motion to dismiss, namely Mr. Madhu's claim for breach of the implied covenant of good faith and fair dealing based on Socure "providing Madhu with false and misleading information in response to his expressions of intent to exercise his stock options during 2021," "failing to determine the fair

---

[5] During the conference, the Court also noted another aspect of the governing agreements that the parties had not raised in their briefing, namely that the Separation Agreement contains a mandatory arbitration clause. After highlighting the arbitration provision, the Court stated the following: "The parties are, of course, free to waive that right . . . . My expectation is that I will move forward and resolve the issue that has been presented to the Court, with the assumption that the parties are waiving that right, unless I get a letter by one or more of the parties by next Thursday at 9:00 a.m. telling me something different." March 2024 Tr. at 5:1–7. Neither party submitted a letter, so the Court understands that the parties have waived the opportunity to arbitrate this dispute, which involves a dispute regarding the terms of the Separation Agreement.

market value of his shares in October 2021," and "failing to issue and deliver shares of Secure common stock to Madhu, or even engage with Madhu, after his October 26, 2021 transmittal to Secure of notice of exercise and payment of the exercise price." *See* SAC ¶ 95.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint

as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "It is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (citation omitted). "The term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Id.* (cleaned up) (citations omitted). However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted). Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

A court may consider documents that are "integral to" the complaint. *Id.* For a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (internal quotation marks omitted)). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's

complaint stands or falls, but which for some reason . . . was not attached to the complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Socure's motion to dismiss is accompanied by the declaration of Timothy W. Cook, which attaches three exhibits. *See* Dkt. No. 67.  Here, the Court has considered Exhibit 1, which is a copy of a written instrument that was attached to Mr. Madhu's complaint, the Omnibus Incentive Plan form of Exercise Notice (the "Exercise Notice").  *Compare* Dkt. No. 67-1 (Exercise Notice), *with* SAC, Ex. C at 42–45.  This written instrument is treated as part of the Second Amended Complaint and may properly be considered on a motion to dismiss.  *See Lynch*, 952 F.3d at 79; *see also* Fed. R. Civ. P. 10(c).

Exhibit 2 consists of email correspondence between counsel for Mr. Madhu and counsel for the Company on August 1 and 3, 2023.  Dkt. No. 67 at ¶ 3.  This email exchange is paraphrased in the Second Amended Complaint.  *Compare* Dkt. No. 67-2 *with* SAC ¶ 53.  It forms part of the basis for Mr. Madhu's claims for breach of contract and breach of the implied covenant.  *See* SAC ¶ 54 (alleging that by refusing to permit Madhu to exercise his options using the "net exercise" method for both the exercise price and withholding tax, Socure breached its contractual obligations under the Option Awards and Separation Agreement); *id.* ¶ 75 (alleging that Socure breached the Option Awards by informing Madhu that Socure would not honor his request to exercise his options using the "net exercise" method for both the exercise price and withholding taxes); *id.* ¶ 89 (same); *id.* ¶¶ 100–101 (alleging that Socure breached the implied covenant of good faith and fair dealing by refusing to permit Madhu to exercise his options in July 2023).  These communications are therefore integral to the Second Amended Complaint and may be considered in connection with this motion. *See DiFolco*, 622 F.3d at 111 (citations omitted).

Exhibit 3 consists of photographs of the contents of a package FedEx delivered to Socure from Madhu on October 28, 2021.  Dkt. No. 67 ¶ 4.  The Second Amended Complaint references

these documents, *see, e.g.*, SAC ¶¶ 40–42, and Madhu relies on them by alleging that this package constituted his late-October 2021 exercise, *see id.* ¶ 42.  The documents are, therefore, integral to the Second Amended Complaint and may be considered by the Court.  *See DiFolco*, 622 F.3d at 111.

### B.   Breach of Contract Under Delaware Law

The Plan and each of the Stock Option Awards are governed by Delaware law.  To state a claim for breach of contract under Delaware law, a "plaintiff must demonstrate:  first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003).

Where stock option agreements are involved, "precise compliance with the terms of the option is required before the sale is enforced."  *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, No. CV 8520-VCG, 2017 WL 1191061, at *30 (Del. Ch. Mar. 30, 2017).  "Because the option itself affords the offeree protection against the offeror's inconsistent action, the general attitude of the courts is to construe the attempt to accept the terms offered under the option strictly."  *Id.* at *31 (quoting 1 Richard A. Lord, *Williston on Contracts* § 5:18 (4th ed. 2006)).

When interpreting a contract under Delaware law, a court must "read the agreement as a whole and enforce the plain meaning of clear and unambiguous language."  *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).  "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."  *Id.* (quotation omitted).  "Language is ambiguous if it is susceptible to more than one reasonable interpretation.  An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person would have accepted when entering the contract."  *Id.* (internal quotation marks omitted).  "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."  *Id.* (internal quotation marks omitted).

C. **Breach of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Law**

"The implied covenant of good faith and fair dealing is a creature of contract . . . ." *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008). The implied covenant is "implied in all contracts." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 444 (Del. 2005). "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.* at 442.

The implied covenant "ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'" *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)). "Courts utilize the implied covenant to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated[,] and courts will invoke the implied covenant to imply terms when necessary to protect the reasonable expectations of the parties." *Id.* (citation and internal quotation marks omitted).

"[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019). Delaware law does not permit use of the implied covenant "as an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." *Baldwin*, 283 A.3d at 1117 (internal quotation marks omitted). "Nor is the implied covenant to be used as a backstop to imply terms that parties failed to include but which could easily have been drafted." *Id.* The implied covenant "thus operates only in that narrow band of cases

24

where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborn Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). "In the Venn diagram of contract cases, the area of overlap is quite small." *Id.*

When a contract is "truly silent" about an issue, and the contract's express terms "naturally imply certain corresponding conditions," the contracting parties "are entitled to have those terms enforced according to the reasonable expectations of the parties at the time of contracting." *Baldwin*, 283 A.3d at 1117 (citing *Dieckman*, 155 A.3d at 361). "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'" *Dunlap*, 878 A.2d at 441 (citation omitted). To sufficiently plead breach of the implied covenant, a complaint "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Baldwin*, 283 A.3d at 1117–18 (quoting *Sheehan v. AssuredPartner, Inc.*, No. CV 2019-0333-AML, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)). "The party asserting the implied covenant has the burden of proving 'that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.'" *Id.* at 1118 (quoting *Dieckman*, 155 A.3d at 367). "When determining the parties' reasonable expectations, courts analyze 'whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose.'" *Id.* (quoting *Amirsaleh v. Bd. Trade N.Y.C.*, No. CIVA.2822-CC, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009)); *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. When conducting this analysis, we must assess the parties'

reasonable expectations at the time of contracting and not rewrite the contract to appease a party

who later wishes to rewrite a contract he now believes to have been a bad deal.").

### D.      Breach of Contract Under New York Law

The Separation Agreement is governed by New York law.  Under New York law, to state a

claim for breach of contract "the complaint must allege:  (i) the formation of a contract between the

parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."

*Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660

F.3d 131, 142 (2d Cir. 2011)).  "When interpreting a contract, our 'primary objective is to give effect

to the intent of the parties as revealed by the language of their agreement.'"  *Chesapeake Energy Corp.*

*v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (ellipsis omitted) (quoting

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232

F.3d 153, 157 (2d Cir. 2000)).  "The words and phrases in a contract should be given their plain

meaning, and the contract should be construed so as to give full meaning and effect to all of its

provisions."  *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99

(2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are

ambiguous."  *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86

(2d Cir. 1998) (citations omitted).  "Whether or not a writing is ambiguous is a question of law to be

resolved by the courts."  *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77

N.Y.2d 157, 162 (1990)).  "Ambiguity is determined by looking within the four corners of the

document, not to outside sources."  *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374

(S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad*

*H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners

of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 864 F.3d at 99 (2d Cir. 2017) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation:  words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather,

"a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks omitted).

On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.").  In other words, courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss."  *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

### E.    Breach of the Implied Covenant of Good Faith and Fair Dealing Under New York Law

"It is well settled that '[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.'"  *Singh v. City of New York*, 40 N.Y.3d 138, 145 (2023) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  "Broadly stated, the implied covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Id.* (quoting *511 W. 232nd*, 98 N.Y.2d at 153).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

That said, a party cannot use the implied covenant to "add to the contract a substantive provision not included by the parties."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (brackets, internal quotation marks, and citation omitted); *accord Murphy v. Am. Home Prods.*

*Corp.*, 58 N.Y.2d 293, 304 (1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."). Nor may the Court interpret the implied covenant to "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 46 (1972)). "[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

Ordinarily, "[a] breach of the duty of good faith and fair dealing is considered a breach of contract." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir. 2004)). Courts have typically found that "raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.,* No. 08–cv–6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008) (citing *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (1st Dept. 1995)); *accord Netologic, Inc. v. Goldman Sachs Grp., Inc.*, 972 N.Y.S.2d 33, 34–35 (1st Dept. 2013) (dismissing implied covenant claims as duplicative of breach of contract claims "since both claims arise from the same facts and seek identical damages for each alleged breach" (internal quotation marks and citation omitted)).

Nevertheless, courts have allowed an implied covenant claim to survive a motion to dismiss where "it is based on allegations different from those underlying the accompanying breach of contract claim." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08–cv–9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) (quoting *Grand Heritage Mgmt., LLC v. Murphy,* No. 06–cv–

5977 (NRB), 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 5, 2007)); *see also id.* at *7 (denying motion to dismiss claim based on implied covenant of good faith and fair dealing).  Accordingly, "to simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *Id.* at *5.

## III.    DISCUSSION

The Court discusses Mr. Madhu's claims in chronological order.

### A.    Breach of Contract Claim Based on Mr. Madhu's "Attempt" to Exercise His Options on October 4, 2021

Mr. Madhu has not adequately pleaded that the Company's failure to issue shares to him when he expressed an interest in exercising his options on October 4, 2021 breached the Option Awards.  Mr. Madhu specifies that the basis for the alleged breach was his "attempt" to exercise his shares on that date.  *See* SAC ¶ 83 ("Socure breached the Agreements by . . . refusing to let Mr. Madhu exercise his options on October 4, 2021 . . . ."); Opp'n at 20 ("As the SAC makes clear, Mr. Madhu's contractual damages claim is based on, among other things, his *attempted* exercise (not a completed exercise) on that day." (emphasis in original)).

Even Mr. Madhu concedes that he did not effectively exercise his options on October 4, 2021.  He only "attempted" to do so.  That is fatal to his breach of contract claim.  As detailed above, the Option Awards require that in order to exercise his shares, Mr. Madhu notify the Company of his exercise.  He does not allege that he notified the Company that he was exercising his stock options on that day in a writing consistent with the notice provisions of the Option Awards or the Plan.  He does not plead that he arranged for the payment of an agreed amount of withholding taxes on that date.  Instead, he pleads only that he informed the Company of his "intent and desire to move forward with the exercise of the options . . . ."  SAC ¶ 32.

Mr. Madhu's claim boils down to an assertion that the Company breached the agreement by requiring that he comply with its requirements.  Mr. Madhu takes the position that an attempt to exercise his options in a manner that did not comply with the terms of the Option Awards and the Plan should be treated in the same way as a valid exercise.  But where stock option agreements are involved, "precise compliance with the terms of the option is required before the sale is enforced." *Simon-Mills II, LLC*, 2017 WL 1191061, at *30.  The Company did not breach the parties' agreements by requiring that Mr. Madhu comply with their requirements.

### B.    Breach of Contract Claim Based on Mr. Madhu's Attempt to Exercise His Options on October 26, 2021

Mr. Madhu's breach of contract claim related to his attempt to exercise his options in late October 2021 founders because he has not pleaded that he tendered the amount of money required to satisfy the Company's withholding tax obligations.  As a result, he has not pleaded that the Company breached the agreements by refusing to issue stock following his delivery of an exercise notice.[6]

Both Option Awards require that a committee of the Company's board calculate the withholding amount that is due.  Section 8(a) of the First Option Award states that "[t]he Committee shall determine the amount of any withholding or other tax required by law to be

---

[6] The Court assumes for these purposes that Mr. Madhu's exercise substantially complied with the requirements of the Option Awards.  The parties dispute whether the fact that Mr. Madhu backdated his exercise notice renders it ineffective.  They also dispute whether the exercise should have been effective on October 26, October 28, or October 30, 2021, based alternately on the date of signing of the notice, delivery of the notice, and the date that the Company received Mr. Madhu's checks.  Arguably, these nitty details are immaterial because Mr. Madhu substantially complied with the notice requirements of the Plan.  Delaware courts have at times "accepted substantial compliance with notice provisions in lieu of literal compliance, when the circumstances so justified." *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, No. CV 2018-0927-SG, 2019 WL 1223026, at *15 (Del. Ch. Mar. 14, 2019) (collecting cases).  "Substantial performance is that which, despite deviations from contract requirements, provides the important and essential benefits of the contract." *Gildor v. Optical Sols., Inc.*, No. 1416-N, 2006 WL 4782348, at *7 (Del. Ch. June 5, 2006) (internal quotation marks and citations omitted).  "The requirement of substantial compliance is an attempt to avoid 'harsh results . . . where the purpose of these [notice] requirements has been met.'" *Id.* at *5.  As described above, the Option Awards permitted Mr. Madhu to use the prescribed Exercise Notice—saying that he "may" use that form.  But the Option Awards did not require that he do so.  As a result, the Plan's provision establishing that he could exercise his options "by notice" was not superseded by the Option Awards.  Mr. Madhu has pleaded that he provided adequate notice to the Company of his intention to exercise his options, notwithstanding the modifications to the form of Exercise Notice.

withheld or paid by the Corporation . . . ."  First Option Award § 8(a).  The Second Option Award does not contain equivalent language.  However, Section 11.05 of the Plan, which applies to both Option Awards, contains a similar provision:  "The amount of such withholding or tax payment shall be determined by the Committee and shall be payable by the Participant at such time as the Committee determines . . . ."  Plan § 11.05.  Thus, the terms of the Plan make clear that a participant must pay the amount determined by the committee at the time specified by it.  Mr. Madhu alleges that he paid an amount that he determined unilaterally after being informed by the Company that the valuation that he was using was incorrect:  he does not plead that he advanced an amount determined by the committee.  To the contrary, he pleads that the committee did not calculate the amount that was owed following his request—that is the basis for his claim for a purported breach of § 2.18 of the Plan.

The Plan contains language that permits the Company to defer the issuance of shares following an exercise in the event that the participant does not forward a satisfactory withholding amount.  The Plan states that the Company "may defer . . . issuance of the . . . shares upon exercising or vesting of an Award unless indemnified to its satisfaction . . . ."  Plan § 11.05.  The Second Option Award gives the Company even broader rights.  It provides not only that the Company can defer the issuance of shares "upon exercise," as provided in the Plan, but that the Company can "refuse to honor the exercise *and* refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise."  Second Option Award § 10(a) (emphasis added).

Mr. Madhu affirmatively pleads the existence of conditions that permitted the Company to refuse his request under the terms of the Plan and the Second Option Award, fatally undermining his claim for breach of contract.  Mr. Madhu pleads that he was informed that the amount that he sent to the Company to satisfy his withholding tax obligations was not satisfactory to the Company.  He pleads that the Company refused to issue him shares as a result.  Because Mr. Madhu alleges that

he paid an amount of withholding taxes that was not satisfactory to the Company, he has not pleaded that the Company breached the Option Awards when it refused to issue him shares. The Plan and the Option Awards permitted the Company to refuse to issue him shares under the circumstances alleged by Mr. Madhu.[7]

### C.   Breach of Implied Covenant of Good Faith and Fair Dealing Claim Based on Mr. Madhu's Attempt to Exercise His Options on October 4 and October 26, 2021

Mr. Madhu has adequately pleaded that the Company breached the implied covenant of good faith and fair dealing with respect to his efforts to exercise his options in October 2021. "[T]he implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted). Read in the light most favorable to him, Mr. Madhu has plausibly pleaded that the Company engaged in unreasonable conduct intended to stymie his efforts to exercise his options.

Mr. Madhu alleges that the Company had no good faith basis to elect not to honor its prior valuation of his shares. He alleges that the term sheet valuing the shares of the Company at $16/share was not binding and that there was no commitment to move forward at that valuation. SAC ¶¶ 37, 41. As a result, he alleges, the Company's refusal to honor his exercise was not justified. Similarly, Mr. Madhu alleges that the Company failed to take steps in good faith to conduct a timely valuation of the Company's stock to permit him to exercise his options. *Id.* ¶¶ 38–40. The Company rejected Mr. Madhu's offers to pay for an independent valuation of the shares. In sum, Mr. Madhu has adequately alleged that the Company took advantage of its ability to control the

---

[7]  This theory of breach, like the theory of breach regarding Mr. Madhu's October 4, 2021 attempted exercise, is separate from Mr. Madhu's claim that the Company breached Section 2.18 of the Plan by failing to value his shares on or after October 4, 2021 when he informed the Company that he wished to exercise his options. *See* SAC ¶ 83. The Court allowed that claim to proceed in its 2023 Opinion, and it is not the subject of Defendant's pending motion to dismiss or this opinion.

timing of valuation of the stock to frustrate his ability to exercise his options.  He has pleaded that the Company engaged in conduct that frustrated "the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442.  Therefore, his claims for breach of the implied covenant of good faith and fair dealing surrounding his attempts to exercise his options in October 2021 survive.

> ### D.  Breach of Contract Claim Based on Mr. Madhu's Effort to "Net Exercise" His Options on in July 2023
>
> #### 1.  The Separation Agreement Is Unambiguous and Does Not Permit the "Net Exercise" Method to Be Used to Satisfy Withholding Obligations

The Separation Agreement is unambiguous:  it permits Mr. Madhu to use the "net exercise" method *to exercise* his options; it does not permit him to use that method to satisfy the withholding tax obligations that are payable upon exercise.  The Separation Agreement was negotiated against the backdrop of the Plan and the Option Awards.  Under the Plan, by default, Mr. Madhu was required to use cash to pay the exercise price for any options and to pay cash for withholding tax obligations. Plan § 6.04.  The Plan allowed the Company to modify those default rules in any option award, and it did so in the First Option Award, which, as described above, expressly permitted Mr. Madhu to satisfy withholding tax obligations by netting out shares that would otherwise be distributed to him. First Option Award § 8.01(c).  So at the time that the Separation Agreement was negotiated, Mr. Madhu was required to pay cash for the exercise price of his shares, and to pay cash for withholding taxes with respect to shares acquired under the Second Option Award, but he could satisfy withholding taxes under the First Option Award in a cashless manner.

The Separation Agreement contains the following language:  "the Company hereby agrees to permit Mr. Madhu *to exercise* Option 1 and/or Option 2 by payment in the form of a 'net exercise' method as described in the Plan."  Separation Agreement § 2 (emphasis added).  The question that the parties debate is whether this language permits Mr. Madhu to exercise his options in a cashless

manner (as both parties agree) or if it also allows him to satisfy his withholding tax obligations in a cashless manner (as Mr. Madhu contends).  The language of the agreement answers that question clearly:  it allows Mr. Madhu "to exercise" his options in a cashless manner.  It says nothing about his ability to satisfy his withholding tax obligations.

The Plan and the Option Awards clearly distinguish between the "exercise" of an option— that is, the action of electing to buy the underlying shares and the payment for those shares—and the payment of withholding taxes resulting from an exercise.  First, this distinction is made plain in the structure of the documents governing the options.  The Plan and each of the Option Awards contain separate sections dedicated to the exercise process and the treatment of withholding taxes. *See* Plan ("Exercise Procedures" at § 6.04; "Taxes" at § 11.04); First Option Award ("Exercise of Options" at § 2; "Withholding" at § 8); Second Option Award ("Exercise of Options" at § 2; "Tax Obligations" at § 10).

Second, the language used in the Plan and the Option Awards clearly distinguishes between the act of exercising the options and the act of satisfying withholding tax obligations.  The Plan defines the "Exercise Price" to mean the amount required to purchase each share of common stock "upon exercise of the Option."  Plan § 2.17.  The "Exercise Price" does not include payment of withholding tax obligations.  Section 3 of each of the Option Awards highlights the distinction between the payment of the "Exercise Price" and the payment of withholding tax obligations. *See, e.g.*, First Option Award § 3 ("the aggregate Exercise Price (as well as any applicable withholding or other taxes) shall be paid by cash or check").

Other language of the Plan and the Second Option Award also expressly distinguishes between the act of exercising the options and the act of satisfying the withholding tax obligations. Section 11.05 of the Plan states that "the Corporation may defer payment or issuance of the . . . shares *upon exercise* . . . of an Award unless indemnified to its satisfaction against any liability for any

such tax."  Plan § 11.05 (emphasis added).  Section 10 of the Second Option Award provides that "the Corporation may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise."  Second Option Award § 10.  The agreements acknowledge the distinction between the exercise of an option and the satisfaction of the withholding tax obligation with respect to it:  a participant can exercise an option, but the Company can refuse to honor the exercise or issue shares with respect to it unless separate provision is made to satisfy the withholding tax obligations.

The Separation Agreement expressly provides Mr. Madhu the right "to exercise" his options using the "net exercise" method.  It does not afford him the right to satisfy withholding tax obligations in that way.  Had Mr. Madhu wished to obtain the right to use a "net exercise" method to satisfy his withholding tax obligations, his lawyers could easily have tracked the language of the Option Awards and asked the Company to agree, for example, "to permit Mr. Madhu to exercise Option 1 and/or Option 2 (as well as to satisfy any applicable withholding or other taxes) by payment in the form of a "net exercise" method as described in the Plan."  They did not do so— they only negotiated the right for him "to exercise" his options using the "net exercise" method, as the unambiguous text of the Separation Agreement provides.[8]

### 2.     Mr. Madhu Has Adequately Pleaded That the Company Repudiated Its Obligations Under the First Option Agreement

Mr. Madhu's breach of contract claims based on the Company's response to his request to "net exercise" his options in 2023 turns on whether he has adequately pleaded that the Company

---

[8] The parties' briefing focuses on a different portion of the quoted language from the Separation Agreement:  "as described in the Plan."  Plaintiff argues that the phrase refers generally to all cashless exercise methods that are permitted under the Plan and the Option Awards; Defendant argues that it refers specifically to the "net exercise" method referenced in Section 3(b) of the First Option Agreement.  *See generally* Def's Mem. at 18–19; Opp'n at 12–14.  In the Court's view, the critical language in the text are the words "to exercise," as described above.  Section 3 of the First Option Agreement permits the payment of "any applicable withholding taxes" using any of the methods described in clauses (a) through (d), including a cashless exercise program as described in clause (b).  The agreement authorizes the Company to permit satisfaction of withholding tax obligations by a cashless mechanism; it does not require it.

repudiated its obligations under the contracts.  Anticipatory repudiation is the only viable basis for Mr. Madhu's breach of contract claims as pleaded, because Mr. Madhu has not pleaded that he satisfied the formal requirements to exercise his options in 2023.  Mr. Madhu's counsel's statement to the Company's counsel that Mr. Madhu "wanted to exercise his options forthwith" was not proper notice of an exercise.  SAC ¶ 52.  Both Option Awards require that notices to the Company be made "in writing" and that they be personally delivered or mailed to the Company at its address.  First Option Award § 13(a); Second Option Award § 15(c).  Mr. Madhu does not allege that his counsel's communication with the Company's counsel complied with the Option Awards' notice requirements.[9]  So Mr. Madhu can only assert a breach of contract claim based on the Company's failure to respond to his lawyer's request if he has pleaded that the Company repudiated its obligations.

Mr. Madhu has adequately pleaded that the Company repudiated its obligations under the First Option Award.  "An anticipatory repudiation [of a contract] constitutes a breach."  *See e.g.*, *Cochran v. Denton*, C.A. No. 11826, 1991 WL 220547, at *1 (Del. Ch. Oct. 28, 1991).  "[T]he doctrine of anticipatory repudiation derives from the principle that, '[i]f it is clear that the promisor intends not to perform his promise, there seems little reason to force the parties to wait to have their rights and obligations determined while markets rise and fall.'"  *Neurvana Med., LLC v. Balt USA, LLC*, C.A. No. 2019-0034-KSJM, 2020 WL 949917, at *21 (Del. Ch. Feb. 27, 2020) (second alteration in original) (quoting *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *5 (Del. Ch. Jan. 13, 1988)).  "'Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions' requiring an 'unequivocal statement' of an intent not to perform."  *Id.* (citations omitted).  "Repudiation may be accomplished through words or conduct.  A party may repudiate an

---

[9] Mr. Madhu also does not allege that he tendered any amount to satisfy his withholding obligations with respect to his options under the Second Option Award.

obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform; alternatively, a party may repudiate through a voluntary and affirmative act rendering performance apparently or actually impossible.  In any event, repudiation must be positive and unconditional."  *West Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, C.A. No. 2742–VCN, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009) (citations and internal quotation marks omitted).

Mr. Madhu has adequately pleaded that the Company repudiated its obligations under the First Option Award.  Mr. Madhu alleges that the Company "told Madhu . . . that it purportedly believed that, under the Stock Option Agreements and the Separation Agreement, Madhu was entitled to use the 'net exercise' method for payment of the exercise price but *not* for payment of the applicable taxes."  SAC ¶ 53.[10]  In correspondence by the Company's counsel, the Company stated that:  "Socure is taking the position that [Mr. Madhu] may only net exercise the price of his options . . . and not the tax obligation from an exercise of those options . . . ."  Dkt. No. 44.[11]  Section 8(c) of the First Option Award gave Mr. Madhu the right to satisfy his tax withholding obligation in a cashless manner.  The communications by the Company outlined in the complaint are sufficiently unequivocal statements of the Company's intention not to honor that right and thus adequately plead a breach of the First Option Award by repudiation.

---

[10] This statement on its own would likely be found by the Court to be insufficiently positive and unconditional to constitute a repudiation—the Company is alleged to have stated only that it "believed" that Mr. Madhu could not exercise those rights.  *See* Restatement (Second) of Contracts § 250 (1981) ("2.  A contracts to build a house for B for $50,000, progress payments to be made monthly in an amount equal to 85% of the price of the work performed during the preceding month, the balance to be paid on the architect's certificate of satisfactory completion of the house.  Without justification B fails to make a $5,000 progress payment and tells A that because of financial difficulties he will be unable to pay him anything for at least another month.  If, after a month, it would be too late for B to cure his material failure of performance by making the delayed payment, B's statement is a repudiation.  3.  The facts being otherwise as stated in Illustration 1, A does not tell B that he will not perform but says, 'I am not sure that I can perform, and I do not intend to do so unless I am legally bound to.'  A's statement is not a repudiation.").

[11] This letter is integral to the complaint.  *See* SAC ¶ 53 ("The Company, though its counsel, reiterated this erroneous position during August 2023, including in communications to the Court.").

The communications do not plead breach by repudiation of the Company's obligations under the Plan or the Second Option Agreement. That is for the simple reason that the Company did not have an obligation to permit Mr. Madhu to satisfy withholding tax obligations in a cashless manner under either of those agreements.

### E.   Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Based on Mr. Madhu's Effort to "Net Exercise" His Options in July 2023

Mr. Madhu has adequately pleaded that Socure breached the implied covenant of good faith and fair dealing by "refusing to permit Madhu to exercise his option during July 2023." *See* SAC ¶ 101. As before, this is because he has adequately pleaded that the Company engaged in conduct that frustrated "the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442. As pleaded, the Company, through its counsel, advised Mr. Madhu that he did not have the right to satisfy his withholding tax obligations in a cashless manner. As described above, that position was not correct insofar as it applied to the First Option Award. The Company's conduct allegedly prevented Mr. Madhu from exercising his contractual rights. Mr. Madhu has adequately pleaded a breach of the implied covenant with respect to the First Option Award.

However, the same conduct by the Company does not state a claim for violation of the implied covenant with respect to the Plan or the Second Option Award. This is, again, because Mr. Madhu did not have the right to satisfy withholding obligations with shares under the Second Option Award.

### F.  Leave to Amend

Mr. Madhu does not request leave to amend his complaint. In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). However, leave to amend may be denied "for

39

good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)); *see also Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 148 n.4 (2d Cir. 2020) ("Under Rule 15(a)(2), leave to amend should be freely given unless there is 'any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018)).  "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA*, 758 F.3d at 505.

Mr. Madhu does not identify how a third amendment would cure the pleading deficiencies identified by the Court.  Those claims that have been dismissed are dismissed as the result of the Court's interpretation of the language of the contracts at issue.  Therefore, the Court concludes that an amendment would be futile, and leave to amend is denied.

## IV.  Conclusion

As stated above, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.  The motion to dismiss Mr. Madhu's breach of contract claims related to his attempted exercise of his options in 2021 is granted.  The motion to dismiss his breach of the implied covenant of good faith and fair dealing claim with respect to those attempts to exercise his options is denied.  The motion to dismiss his breach of contract and breach of the implied covenant of good faith and fair dealing claims with respect to his 2023 attempted "net exercise" of options is granted with

respect to his Second Option Award.  The motion to dismiss those claims with respect to the First

Option Award is denied.

The Clerk of Court is directed to terminate the motion at Dkt No. 65.

SO ORDERED.

Dated:  May 16, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge